Good morning. May it please the Court. My name is Erwin Chemerinsky and I represent Maya Arce and the plaintiffs. I'd like to reserve five minutes for rebuttal. State and local governments have tremendous discretion in setting the curriculum in public schools. But the Supreme Court repeatedly has made clear that there are constitutional limits on that discretion. This is the exceptional case where the State has violated those limits by a law that prohibits speech and does so in terribly overbroad and vague language. It's also a law that was motivated and that was implemented with a discriminatory animus against Mexican-Americans. With regard to the First Amendment, the District Court correctly found that Section A-3 was unconstitutionally overbroad. A-3 prohibits courses or classes that are designed primarily for minority students. All teachers try to engage their students. If a teacher had a class primarily of African-American or Latino students, the course would be expected to teach material designed to appeal to them. An English teacher with a predominantly African-American class who chose to teach the works of Maya Angelou or Toni Morrison would want to follow the statute. A music teacher who brought in rap lyrics or hip-hop for African-American or Latino students would violate the statute. By the same notion, Sections A-2 and A-4 are also unconstitutionally vague and overbroad. Section A-2 says a course or class through resentment on the basis of race is prohibited. Last week we filed for the Court's judicial notice a letter that was sent by Superintendent Huppenthal on January 2nd, notifying the Tucson Unified School District that it's in violation. The example he gives in that letter was a question that a teacher asked about whether American slavery was particularly brutal. How, then, is it possible to teach slavery in a manner that might promote resentment based on race? How might a teacher teach about Ferguson or policing in the United States in a manner that might promote resentment on the basis of race? And Section A-4 is particularly overbroad and vague. Section A-4 prohibits courses or classes that advocate ethnic solidarity instead of treating pupils as individuals. I'm not sure what that means, but again, I would focus you on the examples where Superintendent Huppenthal a week ago Friday found that Tucson was in violation. One was a class that simply said it was going to teach hip-hop music. Another was a class that said it was going to look at Mexican and Mexican-American history. Does St. Patrick's Day promote ethnic solidarity with expense of individuality? Does teaching patriotism? What's so important, Your Honors, is that a statute like this that's vague and overbroad very much violates the students' First Amendment rights. It chills student speech. If you look at the administrative law judge's order, specifically on page 1146 and 1147, he talks about how the look at student work in deciding if there's a violation. Superintendent Huppenthal's letter from January 2nd talks about looking at student work. In fact, Your Honors, there's a declaration in the record. It's from Nicholas Dominguez. It's on pages 1046 and 1047, and he talks about as a student he changed what he wrote in his essays because of knowledge of the law. The vague and overbroad law like this also very much chills what teachers teach, and that interferes with the right of students to receive information. And so there are declarations in the record from teachers in volume 6 of the excerpts of the record. You've got declarations from Curtis Acosta and Lorenzo Lopez in volume 8 from Sarah Rusk that it changed what they did as teachers. And, of course, it's the same thing. Well, I think it was supposed to change what they did as teachers. Yes, Your Honor. And, of course, a State may do so, but when a law is vague and overbroad and it has the tremendous sanctions that this law does, then it risks chilling a tremendous amount of speech, and that interferes with what this Court has recognized and the Supreme Court has recognized as the right of students to receive information. Didn't you agree, I take it, that the State does have the power? The teaching is government activity, and the State has the power to direct what's to be taught. Yes, Your Honor. But when the law like here is enforced by looking at student work, then it goes beyond just regulating government speech. And if you look at the administrative law judge's order and you look at Superintendent Huppenthal's letter from January 2nd, both emphasize the need to look at student work. That's chilling student speech. Well, it doesn't tell the student that he can't speak in a certain fashion, but student work may reflect what the students are being taught. And that, in fact, appears to be what the statute's aimed at. But, Your Honor, that's why the vagueness and the overbreath of the statute is so important. When is a student going to know whether or not an essay is reflective of teaching that promotes racial resentment? The student's not on the spot. There's no sanction being taken against the student. The sanction is being taken against the course. That is, a course that produces this kind of student work is suspicious. But, Your Honor, that draws a false distinction between a sanction against the school district and a sanction where the student suffers. Here, the school district will lose 10 percent of its funds a month. It's about a million dollars a month. Those who would suffer from it are the students. And that's why Nicholas Dominguez Are the students only if what they're not being taught is something they're entitled to receive. No, Your Honor. But it goes to why vagueness and overbreath is so important. Let's take the easy one. Let's take the first one, which is not an issue here. Promote the overthrow of the United States government. Is Arizona allowed to enact that and enforce that provision? Your Honor, I believe under Kishin v. Board of Regents, this, too, would be unconstitutionally vague and overbroad. And I think that the amicus brief led by the Freedom to Read Foundation explains that. And here, too, the example from Superintendent Kupenthal's letter is so important. Notice in his letter of January 2nd, the example he picks that violates that is having lyrics from the group Rage Against the Machine taught. How could any teacher know that a single song would do that? And one of the key problems, Your Honor, is language is taken out of context, from songs, from textbooks, and it is then used for violation. One of the things the Supreme Court this I'm concerned here. Is this an attack on the administrative law judge decision? I mean, Judge Tashima pointed to the ALJ's decision as perhaps the solution to the overbreadth problem. What do you fault in the administrative law judge decision? Well, the administrative law judge attempted to narrow the statute, and Judge Tashima referred to it as sensible. It's important to look at the exact language the administrative law judge used. The administrative law judge says this is going to be narrowed to instances where it is biased, political, or emotionally charged. Your Honor, I would hope that teaching at all levels is emotionally charged. I don't know how to teach about slavery or racism in policing that's not. And bias is so often in the eyes of the beholder. So the narrowing here is just as overbroad and vague. And of course, one of the problems with that is vague and overbroad laws lead to discriminatory enforcement. And that's what you've had here. So in answer to your question, Judge Clifton, this is both a facial challenge to the statute on overbreadth and vagueness grounds, and it's also an as-applied challenge which includes the administrative law judge decision. For indeed, as long as the administrative law judge decision is there, it too will have a tremendous chilling effect on speech of students and of teachers. The other key issue here goes to equal protection. The district court erred by granting summary judgment sua sponte with regard to equal protection in violation of Rule 56F of the Federal Rules of Civil Procedure. And perhaps for this reason, the district court applied the wrong standard with regard to equal protection. I want to remind the Court of its own language with regard to the standard concerning equal protection. This Court said in Pacific Shores v. City of Newport, and the language I'm quoting is from 730F3rd at 1142, Very little evidence is necessary to raise an issue of material fact. Any indication of a discriminatory motive be sufficient to raise a question being resolved only by the fact finder. I would suggest that the evidence in this case more, much more than exceeds that very little evidence standard. To begin with, Horne campaigned for this law by saying he quote – sorry, Secretary Huppenthal campaigned for this law by saying that he wanted to, quote, stop La Raza. And you find that quote on page 1288 of the record. If you look at the dictionary, and this is quoted on page 4 of our reply brief, La Raza is a synonym for the Mexican-American people. For a key official, both in the legislature and the Secretary of Education, with regard to the law, saying he wanted to stop the Mexican-American people by this law, that clearly is enough to go to the trier of fact. Do you think that's what? Was it Mr. Huppenthal or Mr. Horne? Whoever it was that made that statement, was he using it to mean the Mexican-American people? Your Honor, I cannot know what he means, but when you look at words, it's common to look at the dictionary definition, and we quote a standard dictionary in footnote 2, page 4 of the reply brief, that defines La Raza as the Mexican-American people. But, of course, that's not the only evidence of discriminatory intent in this case. When you, Secretary, Horne said that three of the four ethnic studies courses created as a result of the desegregation order likely violated the statute, but enforcement proceedings were brought only against Mexican-American studies. Secretary Horne, before leaving office, found that the entire Tucson program violated the statute, and he did so following none of the procedures of the law. Under Village of Arlington Heights v. Metropolitan Development Corporation, not following proper procedures is key evidence of discriminatory intent. Of course, under Arlington Heights, discriminatory impact is relevant. 90 percent of the students in this program were Mexican-American. But the evidence of discriminatory intent goes much further. I'm sure the Arlington Heights analogy is a very close one. The concern in Arlington Heights is the use of surrogates or subterfuge in order to accomplish a goal of not having certain people live there. In this case, there's not a question of whether Mexican-American students are going to be educated in the Tucson schools. It's a question of what program is offered to them. Yes, Your Honor, but Arlington Heights is the leading Supreme Court case that outlines what evidence is relevant with regard to discriminatory intent. Indeed, the Pacific Shores case, in the language I quoted, says in implementing Arlington Heights, very little evidence is necessary. I think it's notable. What is it? What's the discrimination? I mean, it's not that there's not going to be education offered to Mexican-American children or that there's not education relevant to them. It's that particular programs shouldn't be offered. No, Your Honor. The point is that the reason why the legislature adopted this, the reason why Secretary Horns and Huppenthal found violation was a discriminatory animus against Mexican-Americans. In fact, the district court specifically said Secretary Horns' not following procedures raised, quote, sparks and red flags of discriminatory animus. We'd suggest it's much more than that when you look at the record here. It's also notable that when Superintendent Huppenthal took office, he commissioned his own study. That study, the Cambian study, found no evidence of violation of the He then ignored the report and found his own violations. After that, an additional study was done. It was by the special master in the desegregation case, the Cabrera report. And what's so notable as you think about this is that both the Cambian study and the Cabrera study found that this course was tremendously effective from an educational perspective. And the statistics here I'd point you to on page 202 and 203 of the record from the Cabrera report. It found, for example, in 2008, students who participated in the program had a 108 percent greater chance of graduating than those who didn't. It found in 2008, those who participated in the program passed the standard math test 144 percent more, the writing test 162 percent more, the reading test 168 percent more. The question is, in light of those statistics, is there anything that explains this other than the discriminatory animus? And so, Your Honors, our position with regard to equal protection is there's potentially two explanations of what happened here. A benign explanation, as I said to you, Judge Clifton, an explanation about discriminatory animus. All of what I've just recited and all that's in the record shows that a trier effect could have concluded the latter, and there are specific shores that should have gone to that trier effect. Who would the trier effect be? The trier effect is the judge, because this is a case seeking injunctive and declaratory relief. So was there really, I mean, I understand the summary judgment standard and all, but is there really any difference? If you've heard from the same person who's going to be the trier effect, only you've heard in the summary judgment context, what changes? Well, in this case, an enormous amount changes. The judge erred by granting sua sponte summary judgment. Rule 56F of the Federal Rules of Civil Procedure specifically say that before a court grants judgment without motion, there should be notice to the parties. And here, there's a great difference between the evidence that would be produced on a motion for preliminary injunction as opposed to a motion for summary judgment. I'll give you examples. The district court says there was no evidence as to the Cambium report being disregarded for impermissible purposes. Well, of course there was no evidence. There was no knowledge that summary judgment would be granted, so it wasn't produced. He refers to there being complaints only against Mexican studies programs, but there was no opportunity to present evidence to that issue because, again, it was sua sponte summary judgment. With your permission, I'll reserve the rest of my time for rebuttal. Thank you. I have a couple of questions. Sure, Judge Noonan. You know that Justice Schumer has been a colleague of mine for many years, and I know him as a very fair-minded person. And, of course, he himself had experienced considerable racial discrimination before World War II, so I can't believe that he came with any racial animus. And, you know, I tend to look at, as a starting point, what was the judge like, but do you want to comment on that? Yes, of course. In no way do I attribute any racial animus to Judge Tashima. The racial animus here is about the Arizona legislature and the secretaries of education who implemented the law. However, Your Honors, although Judge Tashima is your colleague, you have to give de novo review on both the First Amendment issue and on the grant of summary judgment. And here I believe that Judge Tashima was correct in finding that A3 was unconstitutionally overbroad and vague, but by the same reasoning, so were A2 and A4. And Judge Tashima made a mistake. He didn't follow Rule 56F of the Federal Rules of Civil Procedure, and maybe for that reason he applied the wrong legal standard with regard to discriminatory animus. I also wanted to ask you, what's the present situation? Has this program continued de facto, even though it's been attacked by the superintendent? Is it still in place? Your Honor, the Mexican-American Studies Program was eliminated after the administrative logic decision because Tucson didn't want to risk to lose funds. But the statute remains in effect, and this is why the letter from Secretary Huppenthal from January 2nd, 2015, is so important. Look at the things that he said currently are violating the statute. They so powerfully show the overbreadth and vagueness of the law. I want to be absolutely clear. The program was abandoned, but what is he objecting to now? I'm sorry, Your Honor. I didn't hear that. I'm sorry. As I understand it, you're saying the school district abandoned the program, but the superintendent is still objecting to something? Yes. The Mexican-American Studies Program was eliminated, but the law remains in effect. And I filed a letter last Tuesday in this Court asking that you take judicial notice of a letter from Secretary Huppenthal issued January 2nd, 2015, finding that Tucson is currently in violation of the statute. That letter shows that this statute continues to have great effect, and that letter shows, better than any hypotheticals I could, how tremendously overbroad and vague the statute is. I'll save the rest of the time for rebuttal. Thank you. Thank you. May it please the Court. My name is Leslie Kiman Cooper, and I'm here on behalf of the State Defendants. I'd like to address the extra record evidence first. The January 2nd, 15th letter, 2015 letter from Superintendent Huppenthal, is not part of the record and shouldn't be, but if it is, I would like to address it. If it is, it should be viewed in context as part of a conversation with TUSD that began with TUSD agreeing to disband its Mexican-American Studies Program after Superintendent Huppenthal adopted the ALJ's decision. That's a long letter. It recounts in great detail the circumstances, and if the Court is inclined to consider it, which it should not because it is irrelevant, read all of it. Secondly, the evidence to which my colleague referred regarding student achievement and the purported effect of these programs on student achievement. That evidence is irrelevant here, and in any event, the special master's study is not part of the record. It was presented to Judge Tashima just a few weeks before he issued his decision, long after the case was briefed and oral argument heard. The State defendants objected to it, and there is no sign that Judge Tashima considered that evidence as part of the record. Moving to the student's First Amendment. Kennedy. But wouldn't it potentially become part of the record or whatever evidence lay behind it if, in fact, summary judgment had been denied? Well. I mean, I understand the argument being made is that the case shouldn't have been submitted and could have been considered by the Court, but for the fact of the summary judgment being granted. Well, I'm not sure. We have the Court could have the Court should have rejected that evidence even if it had been timely submitted. Because it is the evidence of student achievement is irrelevant in this situation. The State has plenary authority to set the curricular curriculum for its public school students. The Supreme Court has recognized this. That doesn't make it irrelevant. If it's demonstrated that a given program produces better results in terms of student achievement, and that program is outlawed, it would seem to support an inference of discriminatory intent if, in fact, educational attainment is more successfully attained or education achievement is more successfully attained through the program. The question here is, in fact, the State's authority to set its curriculum. The State has the authority. Yes. But if the State rejects a program that's more effective in educating children, doesn't that suggest or strengthen the inference that the reason the State's acting is not because it wants to produce better educated children? This program does that, according to this evidence. It seems to me to strengthen the argument that the program or the State's regulation is intended with discriminatory intent to hold back a given group of the student population. Well, I think, then, you need to look at the district court's decision below in its review of the evidence in terms of the equal protection claim. The court, Judge Tashima, carefully reviewed that evidence using the standards set out in Arlington Heights, and he concluded that there was no evidence of discriminatory animus towards a group of people, but, in fact, a concern about a program. Let me ask you about the piece of the statute that was struck down by the district court as overbroad. Yes. Designed primarily for pupils of a particular ethnic group. Why doesn't that by itself suggest discriminatory animus? You need to look at the statute in its entirety. You need to look at the purpose as set out in 15111, the legislature. The statute, though, speaks in the alternative, right? It's you, the, these courses are prohibited if they fit 1, 2, 3, or 4, right? Yes, they do. Right. So why shouldn't we focus, then, on each individually? You can focus, but you still must look at the stated purpose in focusing on each individual prong, and you must also look at 112E3 that specifically permits classes about the history of an ethnic group as long as they are open to and for all students. So we can have the teaching of, about an ethnic group. It's the divisive, segregative, separationist teaching for one group that this statute is designed to prohibit. But it does have subpart 3. Yes, it does have subpart 3. But it doesn't speak at all about the content of the course. It simply speaks of who the pupils are supposed to be. And it's not hard to figure out that some classes are going to be more attractive to some people than others. I mean, nobody would be surprised that a Mexican-American studies program might attract more Mexican-American students. That doesn't necessarily mean the content of that program has to be offensive or contrary to the purpose you've set out or the State has set out in another provision of the statutes. But this statute, 15-112, says you can't have a course that's designed primarily for pupils of a particular ethnic group. Well, that's why I don't think that you could give too much weight to the ethnicity of the students that were in the class when you were deciding how the district had designed the curriculum. This is designed for the statute prohibits courses or classes which are designed for students of one ethnic group, while simultaneously recognizing that courses that include the history of an ethnic group are fine. It prohibits classes that are for an ethnic group, not classes that are about an ethnic group. This is consistent with the purpose of the statute as stated in 15-111 that represents the ethnic group. Roberts. Well, the subsection you're referring to says classes that include the history of any ethnic group. Yes. That would suggest a class in Mexican-American history. Well, that's not just including. That's about that, and it's likely that most of the students assigned up for that would be Mexican-Americans, and that seems to run afoul of subpart 3. I don't think that it runs apart of subpart 3, unless it is designed for the purpose of separating out those students and teaching a separate history that is not applicable to all the students in that school or that district. I'm just maybe not following you. It may be my fault. What's an example of a course that would not violate 1, 2, or 4, but would violate 3, and therefore would be prohibited? If you had a class that is designed for one ethnicity, for the purpose of separating them out, the Irish, the Germans, Jews, Asians, but is not about that group. Well, I'm not quite sure what you mean by purposes of separating them out, unless you're talking about number 4, advocating ethnic solidarity. I mean, what Judge Tsushima said was he couldn't see what was prohibited by 3 that wasn't prohibited by the other provisions, and therefore it had the very great danger of either it was prohibiting something that constitutionally couldn't be prohibited, or it just invited overbreath, invited vagueness, because it served no obvious purpose. And I'm still not hearing an example from you of why that isn't true. Well, I think that you could have a class that was for an ethnic group that didn't necessarily teach ethnic solidarity that would be in violation of the statute. But if the Court is inclined to agree with Judge Tsushima. Well, what is that? You say there could be. I'm trying to imagine what it would be. I mean, your cross appeal argues that 3 should be reinstated. It shouldn't be struck down as overbreath.   And what would that accomplish? And how would it accomplish something that wouldn't suggest discriminatory animus? Well, the discriminatory animus that is alleged here is towards Latinos or Mexican-Americans. And so if the class were for some other group, then the evidence that is offered here, of course, would not be pertinent to that. The you could perhaps have a class in Japanese studies that would be designed solely for Japanese students, perhaps not to not advocate necessarily ethnic solidarity, but that would nonetheless be for them and not be about, and that would be a violation of the statute. And what would be the State's purpose in enacting that? Again, to the State is concerned that all of its students should receive the same foundational education, should be taught as individuals, should not be divided on the basis of groups such as class or race. So if you have a classroom of students, some of which have commanded the English language because that's what their household has spoken their whole lives, and some of which who don't, and the fact that that differential is likely to be reflected in an ethnic differential, the State of Arizona wants to make sure that the students who need additional help in English don't get it, because they're going to be put into a classroom with people that spoke English from day one? Well, there's a specific provision that relates in terms of English language learners, Your Honor. I'm not sure that I understand your question. Okay. Well, try some other class. I mean, I- Supposing you had a course in the public schools of San Francisco in Chinese history. It was theoretically open to everyone, but lo and behold, in designing it, the designers said, you know, with substantial Chinese population in certain parts of San Francisco, we think this will be especially effective in helping Chinese students to understand their history. If that were in Arizona, would that be forbidden by the statute? It could be, yes, Your Honor. And why? How does that not suggest discriminatory animus? We don't want minorities to develop any kind of ethnic pride. I'm not sure that the purpose, that the public school's purpose needs to be to develop ethnic pride. In fact, in some of the legislative hearings that the plaintiffs asked the court to take judicial notice of, some parents noted that it was the role of parents to inculcate those values. I don't know that there's a constitutional right to classes that would inculcate that ethnic pride. But then you've got a problem with the potential inference that the intent of the statute is to make sure that certain groups don't emerge. Why isn't that something that could be inferred in the form of discriminatory animus? Well, we need to look at the purpose of this. The statements that were made by the legislators at the time that this particular statute was passed, which was concern about a program that was divisive and separatist and took students away, that taught values that the legislators believed were antithetical to our constitutional values. See, that, I hear that as a justification for subparts 2 and 4. I don't understand how that's a justification for subpart 3 unless there's a broader animus against the minority population. There's not sufficient evidence, as Judge Tashima found, of that broader animus towards the minority population. The concern that is stated by those who are in favor of this law is in regard to a program, not a people. In terms, if I may, then, address the question of whether or not it was correct for Judge Tashima to grant summary judgments with Sponte on the equal protection claim. In oral argument on the many motions and cross motions, plaintiffs' counsel said, the record is complete with respect to the differential treatment, the equal protection. I think with that and with the substantial evidence that had been presented by the plaintiffs on support of that claim and their others, it was correct for Judge Tashima to grant summary judgment in favor of the State on the equal protection claim. Wouldn't the normal course in a district court be, if a judge was thinking of converting some other motion to summary judgment, to announce that to the parties, give them an opportunity to say whether there was additional evidence that they wanted to present on summary judgment, have them flesh out the record, or not, as the case may be, that's the normal course, yes? Yes. That is the normal course. Why? What was the particular justification for not following that normal course here? Well, I think that, first of all, Judge Tashima could have credited plaintiffs' counsel's statement that their record was complete. Well, was that said in the context of the entire case or just said in the context of the particular motion that was before the judge? There were quite a number of motions before the judge at that point. There was a ---- All the more reason it wasn't ambiguous then. I'm sorry? Wasn't that statement ambiguous? No, I don't think so. Did Judge Tashima say, maybe he did, I don't know, did he say, you mean complete for all purposes and all motions now and forever in this case, counsel? There was no comment by Judge Tashima. And if he had, common sense suggests that counsel would have said, oh, I can't ---- I haven't thought about future motions. No, but he was before the Court on a motion for preliminary injunction, a mandatory motion, a very high standard of proof, presented substantial evidence, lengthy argument, 22 pages on the equal protection claim alone. You'll find that in ER 3, 911 to 33. It was appropriate for Judge Tashima to conclude that the issues had been fully and fairly ventilated. And frankly, I think that you can look at the kind of evidence that they believed that they would introduce to further support their equal protection claim and conclude that that was not evidence that Judge Tashima would have credited. They are reaching beyond the legislative history of the statute in question here to earlier versions that were substantially different and even to statements that were made in connection with other bills. There is no way to tie those statements, those snippets, those cherry-picked little pieces to the legislative intent that animated this bill, and no reason, frankly, that you should look behind the purpose that is stated in 15111 that represents the collective statement of the Arizona, the collective intent of the Arizona legislature in passing this bill. If I may briefly address the First Amendment right. Students' right to receive information was acknowledged by the Supreme Court in PICO, but the Supreme Court also said that was a plurality decision, of course, not a majority. The Supreme Court there also said that Petitioners might well defend their claim of absolute discretion in matters of curriculum by reliance upon their duty to inculcate community values at 868. And even more importantly, the Supreme Court there noted that removal from the library of a book based solely upon the educational suitability would be, quote, perfectly permissible. That is why I think that this Court should be guided by its decision in Downs, where it recognized that curriculum is government speech, and Kirris, a Fifth Circuit decision from 2005, where the Court, the Fifth Circuit, similarly recognized that curriculum is government speech and that the government need not share its podium with another speaker. The Court is, of course, to be guided as well by Epperson, the case involving the teaching in Arkansas of evolution. That's the statute that prohibited that teaching. There, the Supreme Court found that the restriction on curricular speech constituted an independent constitutional violation of the Free Exercise and Establishment Clause, and therefore struck it down. Here, we have no such situation. There is no independent violation of any student's right to receive information. Are there any more questions? If we were to conclude that the third prong is unlawful, is it severable or not? Yes, it is severable as judged. Why? Why? Because the statute, well, as you noted, I believe the statute is listed in the disjunctive. It's or, or, or. You do not need to find all of the prongs have been violated before the superintendent should consider bringing in an enforcement action. Now, wasn't it, as you've told me previously, wasn't it, we have to look at the whole statute, it was designed to be a single coordinated approach to what was perceived as a problem with each section taking meaning from the others and from the overall purpose. I thought that was your argument just a few minutes ago. It was designed. So maybe that suggests that the legislature did not view this as severable. They viewed it as a coordinated package and, therefore, if it turns out that one provision was unconstitutional, the sensible thing is to have them reconsider the entire statute rather than our cherry picking. I think that the legislature could want the statute to be viewed in its entirety. But could write the statute in such a way that if one prong were struck down, that it would still be constitutional. The first thing that the court needs to do is to look at whether the statute functions sensibly without A3, and, in fact, it does. It may not achieve every single purpose of the legislature, but it still functions. And for that reason, this Court should agree, if it strikes down A3, that it is severable and that the rest of the statute stands. Thank you. Mr. Chemerinsky. Two primary points. First, this is a law that prohibits speech and does so in a tremendously overbroad and vague way. There's no doubt that the State can set the curriculum. What makes this case different from what counsel just cited is this is a law that is enforced by looking at what the student's speech is. A3 was properly found by the district court to be uncountably vague and overbroad. It says if there's even a class that's taught that's primarily designed for pupils of a particular ethnic group, it would violate the law. So if a teacher had a class primarily of African-American students and Latino students and taught even a class to appeal to them, that would then violate the statute. You asked the question of severability. We, of course, believe that each of the provisions is uncountably vague and overbroad. But it's important to note that there's no severability clause in the statute. And the question of severability is one of Arizona law. And in Ruiz v. Hall, the Arizona courts said that the absence of the severability clause is relevant. It's not determinative. The Arizona courts have also said the key question with regard to severability, and this is in Hall v. Albrecht, is would the legislature have adopted the provision without the offending section? And we believe, and we've briefed this, that it wouldn't have been adopted. The second ---- Scalia. Is that so clear? I mean, what Judge Tashima found in effect was that the other provisions of the statute were lawful, served the legislative purpose. This one he found, in effect, was not only unlawful, but specifically did not serve the legislative purpose in ways other than were accomplished by the other provisions. So if he's right about that, doesn't severability make perfect sense? No, Your Honor. As we argue at length in our brief, A3 was really at the very core of the statute. If you start with the earliest versions of the law in the legislative process in practice, this is a law that wouldn't have been adopted without A3. If I may just take one more moment to address the second issue, Judge. The second issue is that this statute is unconstitutional as violating equal protection because of the discriminatory animus in its adoption and implementation. We made the point here that the judge erred under Rule 56F. In fact, Judge Rakoff, as you know, the advisory committee notes to Rule 56F, adopted in 2010, say if a judge wants to do summary judgment sospente, it should invite the parties to make such a motion. That was not done here. There is a tremendous difference between briefing for motion for plenary injunction and summary judgment. In fact, the Supreme Court in University of Texas v. Kamenisch and the Second Circuit in Pew v. Goode specifically make this point. I would just conclude with regard to equal protection by saying there is so much evidence here that indicates that there was a discriminatory animus, including eliminating a program that was proven to be tremendously successful. That's enough under Pacific Shores that this should have gone to the trier effect. Summary judgment was wrongly granted and granted sospente. Thank you so much.  Thank you. We thank both counsel for your very helpful arguments. The case just argued is submitted.
judges: Rakoff, Noonan, Clifton